Good morning, Your Honors. My name is Matthew Winter. I'm from the District of Hawaii Public Defender Office. Your Honor, in this case, we've presented two issues, and the issues involve Ms. Perez's supervised release hearing that happened in the district court. The first issue is whether under the Morrisey due process analysis or under Crawford, if Ms. Perez was denied her right to confront the witnesses, in this case, essentially two witnesses. One is the report stating that she failed a drug test, and two is the hearsay evidence brought into court by the probation officer, Mr. Kim. And Crawford doesn't apply in terms in a revocation proceeding, is that right? I agree with that under this Court's precedent. I'd like to still, obviously, keep that issue alive in case the Supreme Court rules otherwise. But putting aside the Crawford issue, I think that under the due process analysis of both the Just one thing further. If Crawford applied, this would be an easy case, is that right? I think so, because it's testimonial evidence. It's actually the sole evidence that accuses Ms. Perez of the basis of the violation, which is that she tested positive. Unless it's a business document. Well, that still wouldn't matter. Okay. Go ahead. Yeah. I think under Crawford, this would be a no-brainer. But under Morrisey, under the due process analysis, I still think this weighs heavily in Ms. Perez's favor. Under Morrisey and Martin and Comito, the test is basically to balance two things. The defendant's side of the scale is the importance of the hearsay evidence, the Court's ultimate finding, and the nature of the facts proven by the hearsay evidence. And the government's side of the scale is weighted by the difficulty and expense of bringing a witness and the traditional indicia of reliability of the hearsay evidence. Here, everything weighs in Ms. Perez's favor. The evidence is the report, is the testimony of the probation officer. That was the sole thing that the district court relied upon. There was no other evidence put forward that Ms. Perez took drugs, tested positive, or purposely missed her testing. Well, the people who did the first testing did testify. So we're talking just about the lab people. Correct. But even under both the testimony from the Schneibels, who were the people that tested her locally, and some precedent that we cited in this Court, those tests are unreliable. The Schneibels, in fact, themselves said that our tests are not reliable proof. They couldn't sustain a standard in front of the district court. And they said that's the sole purpose on why it's dictated to us that we send those tests out to Virginia. So they far more so said that they're not reliable. But why would you have asked the people from Virginia if they had testified? What would have been the point of their testimony? In this case, it's really important because we have a major discrepancy in the document, which is the test. The discrepancy is the test says Ms. Perez tests positive for cocaine. But then the test also says that there's been some failure along the line. The report says specifically that this was diluted. And there's no testimony really saying what that dilution means. We have somewhat of an answer from the probation officer, Kim, who says that he called the test center, and they said that a dilution means that actually urine was placed into some other liquid, like water. And then we have the testimony also from Mr. Kim, which says something like, from the probation officer's collective thought back at the office, dilution might mean that it was placed into a bladder or some other device, then excreted into the test vessel. The problem in this case is then we have the stark contrast in the testimony. We have the schnabels who come in and say, we witnessed every second of the urinalysis test. We watched her. There was a mirror behind her. We saw the urine go into the test vessel. The test vessel then went to the counter. It was tested and sealed. Kagan. Ultimately, what you're suggesting is that it was the wrong urine. Well, if so, then then that's what would be the only point of this whole inquiry. Yeah. I think even the test center said that there was something wrong fundamentally with this urine sample. And so it's either the wrong urine or it got contaminated or there was some massive failure of the test in Virginia. Any of those things could have been tested if that was available. Including the placement of urine in Virginia that contained cocaine. Correct. It's it's it's we were not able to challenge to question anybody along this chain of questions. And so there's this this disjunctive series of events that the test center says the urine was contaminated or I don't want to use the word contaminated that it was diluted and which we know from a case I cited that that means that the test should fail. And then we know from the Schneibels that. Should fail meaning what? Should fail. What do you mean by should fail? The test should fail. Your Honor, I cited. But I just don't know what you mean by those words. I cited a case and I'm forgetting it right now. A Second Circuit case, which actually had the testimony of this, the scientific testing lab director. And he talked about what the different levels of creatine and other substances in the urine, what levels they need to have a reliable test. Meaning so when you say should fail, you mean it should be considered unreliable and unreliable. Yes. I use the wrong word there should be deemed unreliable due to the problems with the test. And that is the fundamental problem here is the document that was relied upon by the district court itself had the discrepancy in it. So this is a case where not only did we miss the opportunity to cross-examine that witness who says I tested these drugs and these or I tested this urine and this urine had drugs, but we also didn't get to cross-examine him on his second conclusive statement, which is this test has problems. There is some confusion here. The suggestion, at least in the Martin case, that if there was an opportunity to retest, that would be a substitute for cross-examination. Now, as I understand the facts here, your client did ask at the time of the original pretest for to do a new sample, and she was not allowed to do that. Correct. And I think that's a red herring. There is some documentation in the record that there was more urine available for testing. Was there any an offer directly made to retest it? No, and I think that's a red herring. It's the government's burden to prove that this test is positive. I don't think we can we should. But what about the answer to my question? I'm just I want to follow it through. I mean, what exactly happened here with regard to a possibility of a retest, other than the fact that there was it could have been done, but did anybody offer to do it? No. Did your client ask to do it? No. She asked at the time to be tested again at the local laboratory. Did she refuse to do it? Would somebody offer her to do it? No. In fact, she then immediately after the testing. I mean, with regard to the test in the Virginia lab, did anybody say, why don't we just do a retest? And she said no? No. No. No. That's not a part of this record. And I think the short answer, at least my answer from the defense side, is that that would subject Ms. Perez to unconstitutional burden in this case. The government has to prove that the test was dirty, and it's their burden to do so. Ms. Perez has the right to challenge it, including if she wants a retest, but by no means is there a requirement that she has to request a retest before a challenge can be valid. As to the second issue, even based upon this evidence that was brought before the court, there is insufficient evidence for the district court to have reached the finding it did. The evidence must be based upon verified fact. The revocation should not occur, and this is Morrissey, because of erroneous information. And in this case, the court was given information that the Schneibels, the testers in Honolulu, watched Ms. Perez urinate. They watched the cup go to the counter. The test was, at least in Honolulu, the testimony is that there was no way that it could have been tampered with and that it was a pure test that was then sent off to Virginia. And then we have the testimony through the hearsay evidence that that test had a problem in Virginia. Based upon that, there is nothing to explain why the court should rely on it. The court is faced with a decision that we have a clean test in Honolulu and something wrong with the test in Virginia. And based upon those facts, I think the due process requirement there that the result be based or the decision by the district court be based on verified facts showed that the district court did not do such. And based upon that, I think under the sufficiency of the evidence that was presented at that hearing, the district court made error. Kennedy. How about addressing the first count that she refused to submit to testing? That, I think, is tied to this whole erroneous test, because, as you see from the record, the district court went off for some time about Ms. Perez's credibility. Now, Ms. Perez never testified, so the finding by the district court concerning her credibility could only be made if the district court believed that her test was absolutely dirty, yet Ms. Perez, through the testimony, had been demanding a clean test, a new test, and stating that she was clean to her probation officer. That finding could only be made upon the district court's belief that her credibility was at issue because of the false test. Kagan in a more narrow basis. In fact, she did not show up on the 19th. Correct. But I think the record is – I'm sorry. And I guess the question is whether that would have been or was a co-equal basis for the revocation, such that this other – the dirty test doesn't matter, is really the question. Or do we in any event need to go back, because we don't know what the district court would have done if he had only made the earlier show. I think actually both scenarios apply. First is that – I think it's Comito that said that you can't really divide what the district court was thinking or separate what the district court was thinking and whether or not she would have given a lower sentence based upon the missed test. And in this case, there was factors favoring Ms. Perez. Her brother had died, passed away that morning. She was at the probation officer. Secondly, just based upon the evidence, I think it's still insufficient that she refused to test. She went to the probation officer. They didn't say she refused to test. I thought they just said she didn't show up. No. The allegation is refusal to test. And she did show up. She showed up at the probation officer. Oh, and she left by mistake. She just left. And again, the record is clear. That's the morning she found out that her brother passed away, but she still came to the probation office with the records from her test – her testing or her trip. And then after – the probation officer called her either that day or the next day. She returned to probation and tested clean the following day. So I think there's no basis for a refusal to test. Okay. Thank you very much. Thank you. Good morning. I'm Tracy Hino, Assistant U.S. Attorney from the District of Hawaii. What's interesting about this case is that we have two issues, the confrontation issue and the decision to revoke issue. But in order to analyze the confrontation issue, you really have to go back out of the border sort of chronologically and look at the decision to revoke. And the reason that's important – I think that's the single most important fact in this case, and that's why I quoted it and cited it twice in my brief. The judge made it absolutely crystal clear that notwithstanding the scientific evidence in this case, that if another defendant had appeared before her with more credibility, she might have found that that testimony was sufficient to rebut the scientific evidence. And the reason that's important is because the judge framed the issue as being one of two scenarios. One, that the defendant had managed to substitute some sort of bladder and supplied diluted urine, basically hoodwinking the collection people. The other possibility was the possibility raised by the defense, that there was some mistake in the testing procedure. Let's concentrate on the first possibility. I thought from the record that there was testimony that while she was giving the sample, she was in a room totally surrounded by mirrors and under the observation of a trained operative from the Federal Government who testified that she did not substitute anything. The judge said, people do this, and based on this general amorphous knowledge unbacked by any evidence in the record, he found that she may have done that. Don't we have a problem here as far as due process is concerned when there's no evidence that she did it and the judge is basing himself on some unexamined, uncross-examined knowledge? There is evidence that she did it, Your Honor, and that evidence is the fact that the creatine level and the specific gravity. But that assumes that she was in sole control of the specimen at all times. She wasn't. It went to a lab. Now, we have a situation when she was in control of the specimen, she was watched by the Federal agent. The Federal agent said he didn't see her, she didn't see her use a bladder or any other instrument to dilute the sample. Now the sample goes to the lab. The sample comes back from the lab diluted. Do you think that the evidence shows that the defendant diluted it more probably than that the lab diluted it? No, Your Honor. I do a lot of these cases. We do a lot of revo cases. You're sounding like the judge. Isn't this somewhat unusual in that, A, we have two neutral people saying she couldn't have diluted it? I was watching her. They were quite emphatic. They were not mild-mannered about it. They were quite emphatic. She didn't do it. She couldn't have done it, they say. What they said was, Your Honor, that to the best of their ability, when the defendant came in, she was quite flustered. She said that she was having her period. They had to wait a while. And, you know, there would be no way for them to be able to observe a test tube or a little tiny receptacle in the defendant's vagina. All she would have to do is reach up with her finger and prick a little piece of aluminum foil. Okay. But I was just going to continue to say. But at least we have somebody other than her saying that this is at least improbable. And then we have a notation which is being relied upon. Excuse me, Your Honor. We have a notation in the lab report that the only explanation for which is a hearsay explanation, right, by someone else. We don't even know exactly what it means. Well, the probation officer testified as to what it means. Hearsay. Yes, Your Honor. We don't know what this lab, how much dilution it would take to record that or how much dilution there was. They may have those records. But we don't know because nobody testified. And that could be relevant similarly to the question of whether this was her urine or a mistake or something that was diluted later. Because if there was really a lot of dilution, one becomes somewhat less believing of the fact that it's her urine. Maybe she could have diluted it a little. But it seems unlikely she could have diluted it a lot while this person was watching her. So it's an unusual case in the sense that unlike Martin, where as far as I can tell, there was no problem with the urine that could have been the subject of cross-examination. Here we know there's an issue. There's something to be cross-examined about. And that's why in this particular case the defendant had quite a bit of confrontation, Your Honor. We called in this case the lady that collected the urine. We had the gentleman that assisted in the testing of it. We called the probation officer who was able to put on the defendant's statement that, you know, that she wanted to be retested. We had the probation officer discuss the case with lab personnel. And we finally put on the second probation officer once again so the defendant could set forth her defense. And again, you know, that's why in this particular case the judge framed the issue one of two ways or as either of two things happening. One, that there was a mistake with the evidence. Two, that the defendant had successfully managed to substitute the urine in the collection process. But where was the evidence from which the district court could conclude that the defendant had substituted the evidence? You talk about credibility. We can't consider that because she didn't testify, right? She testified. Put that to one side. Because otherwise if you're talking about credibility when she didn't testify, what you're talking about is a misuse of 404B evidence, in other words, character evidence. She's a bad girl in the past. She's a bad girl at this time. Can't do that. So next, where's the evidence? Billy Schnabel said that she observed her at all times. And there was no substitution. There was no dilution. If she did, and Billy Schnabel is not in the defendant's pocket. If anyone's pocket, he's in your pocket. So where's the evidence from which the judge can determine, as a matter of fact, it's more probable than not, that the defendant diluted the sample? The evidence, Your Honor, as set forth by Chief Judge Gilmore, was the fact that the test result came back as tampered. And the judge stated that in her experience, defendants have tried all manner of trying to substitute urine items, including the use of bladders, internal devices. Because everybody else does it, that means the defendant did it. Anything problem with that? Your Honor, in this case, the sample didn't come back as a defective sample. It came back as a sample where the specific gravity and the creatine levels indicated that the sample had been diluted in this particular case. And so they were still able to test for drugs in this particular case, but the sample had been tampered with. The probation officer testified that in addition to talking to the lab, in the collective experience of the probation office, that this meant that the sample had been watered down, not that someone had been drinking lots of water in order to flush it. That was his testimony. If you rely on the testimony in the case cited by my colleague, it could mean the other thing as well. It could mean that the defendant had just consumed large quantities of water. In that case, the test would have been consistent. In the case that was cited by Mr. Winter, someone from the STLI lab testified there that a dilute reading could also include somebody consuming large amounts of water. So in that particular case... Kagan So what about briefly, because your time is almost up, your brief spends a lot of time in the Martin case, and the fact that there was a mention there of the denial of a right to retest and that had there been a retest, perhaps that would have been a substitute. Now, here, and you suggest that the defendant here declined a retest. But as far as I can tell, the only thing the record demonstrates is that a retest would have been possible, not like anybody offered to do one. Am I right about that? Verrilli, Jr. Oh, that's correct, Your Honor. A retest was possible. And the reason I mention that, you know, to me, the right of confrontation is not limited to a defendant merely cross-examining the government's witnesses. The defendant has the right to call... Kagan But essentially, as I understand it, the reason why we have this problem at all is you didn't want to fly this person across the country to testify. I mean, there's no other reason, right? It's simply a pain. Verrilli, Jr. That's correct, Your Honor. It's 5,000 miles. Kagan Yes. And first of all, you know, in the modern age, there might have been substitutes for that, like a TV or a telephone. But the other is that I suppose you could have affirmatively offered a retest or even affirmatively done a retest. Verrilli, Jr. That's correct, Your Honor. But that the Court's finding that there was a substitution or adulteration of the urine... Kagan All I'm trying to do is get off the page this reliance on an attempt to distinguish Martin because of the retest option. It doesn't seem to me to be terribly relevant. When she wasn't affirmatively offered a retest, you're just saying maybe she could have asked for one. Verrilli, Jr. Well, in the Martin test, you're talking about the virtual complete denial of the right confrontation. In this particular case, the defendant was able to make his defense. He was able to get out from the witnesses that there was no substitution. He was able to, if he had requested a retest, obtain that retest. Kagan Well, that's what we don't know. We don't know that because that's what I'm trying to say. All we know is that the urine was available. We don't know whether the judge would have allowed it. We don't know whether you would have allowed it. We don't know that. Verrilli, Jr. That's correct, Your Honor. You're correct. I think the final point I wanted to make, Your Honor, again, to distinguish this case from Martin, relates to the consequences of the Court's finding. I've had a lot of cases where the judge will say, well, you know, these are the results. You know, my hands are tied. You know, you said this, but we have scientific results. This case wasn't like that. You know, in her wisdom, Chief Judge Gilmore just unequivocally stated that notwithstanding the scientific evidence, if another defendant had appeared before her who had more credibility tied in with the diluted test results, tied in with what the Schnabels testified to, that she might come up with a different decision. So this isn't a case where we're saying, well, this is a different case. Kagan But as Judge Bay has been pointing out, this woman did not testify. Therefore, why is her credibility an issue here? Roberts Your Honor, she didn't testify, but I provided the witnesses for the defense to allow all of her statements to come in through those witnesses. If you take a look at the last probation officer, Probation Officer Dinello, I called her, and Mr. Winter also wanted her as a witness, but I called her. And the only reason I put her on the stand was so she could put forth in the record the fact that the defendant did, in fact, request a retest. Now, that in no way helped my case, but I put her on for that reason, and Mr. Winter didn't have any questions for her. So the statements from the defendant, exculpatory statements from the defendant came out from both of the Schnabels, because of her denials, came out through the probation officer, through her denials, and it came out through Probation Officer Dinello, the last probation officer. So we definitely had her statements in the record. And Judge Gilmour specifically addressed that issue by saying, you know, there is an effort here on the part of the defendant to rebut the scientific evidence through her statements, which have come in through the various witnesses. The judge looked at the, assessed the credibility of the witnesses in this case, looked at the scientific evidence, balanced everything, and in her discretion, ruled in the government's favor. So not only have we distinguished the Martin case, but the real issue in this case was credibility, and that's why I cited that passage there twice. How does a credibility finding tell us how the dilution was caused? The only person who testified as to how the dilution might have been caused was Federal Agent Schnabel, who said it was not caused by any manipulation by defendant, because I was watching her. If that's the only evidence, it's only logical that the dilution was caused samples tampered with at the lab. Well, we have, we have, we have, we have two things here, Your Honor. We have a scientific test and we have the observations of a person. I don't think you can say that all scientific tests are infallible, and I don't think that you can say that. Scientific test does not answer the question of what urine was being tested. I don't think, well, what I was going to say, Your Honor, is I don't think that you can say that the observations of someone are also infallible. No, of course they're not infallible, but the government has to prove by preponderance of the evidence, and she has to have the right to cross-examine. And when there is a conflict in the evidence this way, which there is, that's why it seems so important to me that this was not an issue in the sky. It was not, in Martin, as far as I can tell, there was no real dispute about, about the, the, the physical evidence. It was just that she ought to have been able to ask some questions. But here there was really something to ask a question about, and she didn't get to ask the question. Well, Your Honor, we have a woman who's, you know, sitting on a toilet, who's flustered, who's saying that she's having her period. And, and if you believe that it would be impossible for that woman to be able to secrete some sort of receptacle in her vagina. No, it doesn't have to be impossible. We're just looking at the evidence. Anyway, you've done a nice argument, and your time is up. Thank you. Thank you very much, Your Honor. We'll give you a couple minutes. I just want to make one point. The government brought up the issue of the distance between Virginia and Hawaii. And I can't see that as the answer. Otherwise, people in Virginia would, of course, get their right to confront and have more due process than, than people as we come out towards Hawaii. And I think Hawaii would, in that case, always get the short end of the stick. And then the government will also have the trump card of maybe all of a sudden the Do you know whether in Hawaii, because you must have this problem particularly, there is a tendency to do telephone or tele, or, or video appearances of witnesses? I can tell the court. I've, I've only practiced at that office in Hawaii for two years. I had a misdemeanor case that was going to go to trial with a defendant actually appearing through video conference. I can't speak as to how the court handles these types of situations. I don't think it would be obvious.   And that's my thought for this type of case. Thank you very much Mr. Chairman. Mr. Hino, if I pronounce it correctly, made a point which I'd like you to address. True, defendant did not testify, so therefore credibility of her as a witness was not tested in court. But her statements about what occurred were relayed to the court permissibly as the statements of a party litigant defendant. And the credibility evidence was used to discredit those statements. What's wrong with that? What's wrong with that is the only way her statements are, I'm not dirty, please retest me. Essentially, if we boil it down, that's the statements that were brought in through the government's witnesses. In order for the judge to find those statements to not be credible, the judge would have to believe that the test was valid and she was dirty. So the judge would have to accept the hearsay evidence of the testing lab in the Virginia and the report and the probation officer. Through that evidence, the judge could say, hey, I know she's dirty, and then that is contrary to the statements made by the defendant. So the problem still goes back to this. You can't use a prior bad act as affecting her credibility. I agree with that analysis, but I think more importantly here is the fact that in order for the judge to discount that, the judge has to believe the faulty test was correct. And so I think we go back to the test in this scenario. Okay. Thank both of you for a really helpful argument in a case that turns out to be more interesting than it might have appeared. Thank you. Thank you for your time.
judges: Gibson, Tashima, Berzon